UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>Town of Wolfeboro</u>

      v.                          Civil No. 12-cv-130-JD
                                        Opinion No. 2014 DNH 107

<u>Wright-Pierce, Inc.</u>


O R D E R


     Wolfeboro brought suit against Wright-Pierce, Inc. after
Wolfeboro's wastewater treatment system, which was designed and
engineered by Wright-Pierce, failed.  Wolfeboro alleged claims of
professional negligence, breach of contract, negligent
misrepresentation, fraudulent misrepresentation, and violation of
the New Hampshire Consumer Protection Act, RSA 358-A.  The jury
trial began on April 15, 2014, and concluded with the jury's
verdict on May 9, 2014, in favor of Wolfeboro on all claims.  The
jury awarded $6,795,000 in damages.[1]

     Wolfeboro demanded a jury trial on all claims, including the
Consumer Protection Act claim.  New Hampshire cases hold that the
court is "'vested with the authority to decide claims brought
under RSA chapter 358-A.'"  <u>George v. Al Hoyt & Sons, Inc.</u>, 162
N.H. 123, 138 (2011) (quoting <u>Hair Excitement v. L'Oreal U.S.A.,
Inc.</u>, 158 N.H. 363, 369 (2009)).  Therefore, in this case, the
court ruled that the Consumer Protection Act claim must be

---

[1]Wolfeboro claimed damages in the amount of $7,698,532.42,
to be awarded on all of its claims.  Therefore, the jury made one
damages award.

decided by the court and submitted the claim to the jury for an advisory verdict only.

I.   Jury's Verdict

The Consumer Protection Act claim was submitted to the jury with two liability questions on the verdict form.  The jury was first asked:  "Do you find by a preponderance of the evidence that Wolfeboro has proved its Consumer Protection Act claim?"  The jury answered, "YES".  The jury was then asked:  "Do you find by a preponderance of the evidence that Wolfeboro has proved that Wright-Pierce willfully or knowingly engaged in unfair or deceptive acts or practices?"  The jury answered, "YES".  The jury awarded $6,795,000 in damages.

II.   Findings and Rulings

Under Federal Rule of Civil Procedure 39(c), the jury's verdict is advisory only.  "'[T]he responsibility for the decision-rendering process remains with the trial judge' and 'it is in [the court's] discretion whether to accept or reject, in whole or in part, the verdict or findings of the advisory jury.'"  United States v. Shields, 649 F.3d 78, 84 n.5 (1st Cir. 2011) (quoting 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2335, at 354-56 (3d ed. 2008)).

The parties contested numerous facts and opinions throughout the trial.  Furthermore, the credibility of witnesses was a very significant issue in this case.  Recognizing that the court has

2

an independent decision-making responsibility and can accept or
reject in whole or in part the jury's advisory verdicts, the
court accepts the jury's verdicts on Count V, the Consumer
Protection Act claim.  The court's decision is based on its
evaluation of all of the evidence; consideration of the testimony
and evidence that the court finds credible and persuasive,
including the testimony of those expert witnesses whose opinions
were properly supported and helpful; and application of the
elements of the claims as provided by the governing law.

      A.  <u>Findings of Fact</u>

The evidence presented at trial supports the following
factual findings by a preponderance of the evidence:

1.  Wolfeboro operates a wastewater treatment facility.

2.  In April of 2005, the New Hampshire Department of
Environmental Services ("NH DES") issued Administrative Order No.
WD 05-014 in which the NH DES found that Wolfeboro's wastewater
treatment facility violated state statutes and regulations and
ordered Wolfeboro to, among other things, develop a plan for
wastewater treatment and disposal.

3.  At that time, Wolfeboro's wastewater treatment plant was
a 600,000 gallons per day secondary treatment plant that used a
holding pond and spray fields to dispose of treated effluent.

4.  In 2005, Wolfeboro hired Wright-Pierce to assist
Wolfeboro in responding to and complying with the Administrative
Order.

5.   Wright-Pierce is an engineering firm specializing in water, wastewater, and infrastructure services for public and private clients throughout New England.

6.   In 2006 and 2007, Wolfeboro entered into contracts with Wright-Pierce to provide additional services necessary to comply with the Administrative Order and to design and engineer a new wastewater disposal system.

7.   In performing its work for Wolfeboro, Wright-Pierce engaged in commerce in the State of New Hampshire.

8. Pursuant to its contracts with Wolfeboro, Wright-Pierce investigated and evaluated alternative means of effluent disposal and recommended a rapid infiltration basin ("RIB") system.

9.   Wright-Pierce investigated potential sites for the RIB system and recommended locating the RIB system on property that Wolfeboro did not own, referred to as the Wolf 1-A site (Whitten property).

10.   In 2006, Wright-Pierce represented that the Wolf 1-A site was particularly well-suited for a RIB system, was the best site, and was a "gold mine" for that purpose.

11.   The wastewater treatment plant has a capacity of 600,000 gallons per day.  The goal for the new wastewater disposal system was to dispose of the flow capacity of the plant, 600,000 gallons per day.

12.   In September, October, and December of 2006, Wright-Pierce represented to Wolfeboro that the Wolf 1-A site would have

the ability to effectively dispose of the entire capacity of the
wastewater treatment plant, 600,000 gallons per day.

13.  Wright-Pierce set an effluent flow goal of 600,000
gallons per day for the RIB system at the Wolf 1-A site, before
Wright-Pierce completed its investigation, assessment, modeling,
and analysis of the capacity of the site.

14.  Wright-Pierce knew when it represented the flow
capacity of the Wolf 1-A site to Wolfeboro that it did not have a
basis to make that representation.

15.  After representing the capacity of the site to
Wolfeboro, Wright-Pierce continued to work on the investigation
and documentation that would be necessary to obtain permits from
the NH DES for the RIB system at 600,000 gallons per day flow
capacity.

16.  In early 2007, Wright-Pierce hired Jesse Schwalbaum of
Watershed Hydrogeologic, Inc. to develop a groundwater computer
model of the RIB system at the Wolf 1-A site.

17.  Wright-Pierce intended to "reverse engineer" the model
to support the intended result of 600,000 gallons per day.

18.  Schwalbaum relied on data and information provided by
Wright-Pierce and did not do any investigation of the site
himself.

19.  When Schwalbaum reported that the model did not support
a flow capacity of 600,000 gallons per day, Wright-Pierce
directed Schwalbaum to alter the model, without any new data to

support the changes, to achieve the result of 600,000 gallons per day of flow capacity.

20.   Wright-Pierce knew when it directed Schwalbaum to alter the model that data from investigations at the Wolf 1-A site contradicted those alterations.

21.   Despite the alterations and manipulations of the model directed by Wright-Pierce, Schwalbaum reported to Wright-Pierce that the model would not support a flow of 600,000 gallons per day and said that he could recommend only 400,000 gallons per day.

22.   Peter Atherton of Wright-Pierce knew that the Wolf 1-A site did not have a flow capacity of 600,000 gallons per day.

23.   Atherton reported to David Ford, Director of Public Works for Wolfeboro, that the Wolf 1-A site had the flow capacity of 600,000 gallons per day when he knew that was false.

24.   The model showed only steady state flow capacity for the site, meaning a flow capacity without daily variations and without considering an annual average.

25.   An annual average flow rate is different from a steady state flow rate and different from a maximum daily flow rate.  An annual average flow rate does not assume a constant flow rate and does not impose a daily maximum amount of flow.  Instead, an annual average flow rate is based on an average, the total amount of flow for a year divided by the number of days, and the daily flow rate may vary above and below the average flow rate.

26.   Schwalbaum's final report stated a flow capacity for the site of 600,000 gallons per day, but not an annual average flow capacity of 600,000 gallons per day.

27.   Wright-Pierce's hydrogeologist, Gary Smith, told Atherton that the modeling results did not show that the site could handle an annual average flow of 600,000 gallons per day.

28.   In March of 2007, Wolfeboro submitted to the NH DES the Preliminary Design Report, the Wastewater Disposal Alternatives Evaluation, and the Phase 3 Hydrogeologic Report that Wright-Pierce had prepared.

29.   Wright-Pierce stated in the Phase 3 Hydrogeologic Report that an annual average treated effluent discharge of 600,000 gallons per day at the Wolf 1-A site was feasible when Wright-Pierce knew that amount of discharge was not feasible.

30.   Wright-Pierce knew that the Wolf 1-A site did not have the capacity to dispose of an annual average of 600,000 gallons per day.

31.   Wright-Pierce never told Wolfeboro that the flow rate in the Phase 3 report was wrong or that the Wolf 1-A site did not have the capacity for an annual average flow rate of 600,000 gallons per day.

32.   Based on Wright-Pierce's knowing misrepresentations about the RIB system and the Wolf 1-A site, Wolfeboro purchased the Wolf 1-A site for $1,050,000 and proceeded with the RIB system project.

7

33.   Based on Wright-Pierce's knowing misrepresentations about the RIB system and the Wolf 1-A site, the NH DES issued a groundwater discharge permit for the Wolf 1-A site for the disposal of an annual average flow of 600,000 gallons per day, GWP-200707014-001.

34.   Wright-Pierce designed and engineered the RIB system, and Wolfeboro paid Wright-Pierce more than $1.5 million for its services.

35.   Construction of the RIBs began in 2008, and the system was completed in early 2009.

36.   Operation of the RIB system began on March 3, 2009, in accordance with communications among Wright-Pierce, the NH DES, and Wolfeboro.

37.   On April 17, 2009, Wolfeboro staff noticed groundwater coming to the surface in the central groundwater discharge area of the RIB site.

38.   On April 20, 2009, Wolfeboro staff found that the same area had developed into a slope failure.

39.   In June of 2009, Schwalbaum reported to Wright-Pierce that the data he had been given for the model of the Wolf 1-A site in 2007 was incomplete, that the 2007 model predicted seeps along the slopes with a flow rate greater than 600,000 gallons per day, and that his efforts to recalibrate the model based on 2009 data were not helpful because there were too many unknowns.

40.   Wright-Pierce did not inform Wolfeboro of Schwalbaum's report.

41.   Wright-Pierce represented to Wolfeboro after the
problems developed at the RIB site, knowing that its
representations were false, that the site could be repaired and
that, when repaired, the site had the capacity to dispose of an
annual average flow of 600,000 gallons per day.

42.   As a result of Wright-Pierce's actions and omissions,
the Wolf 1-A site has been irremediably damaged and the Wolf 1-A
site is a total loss.   Wolfeboro has spent millions of dollars to
buy the property for the Wolf 1-A site, to obtain financing for
the wastewater disposal system project, to have Wright-Pierce
design and engineer the RIB system, to obtain the necessary
permits from the NH DES, to have the system constructed, to
construct and operate a substitute system, and to address the
defects in the RIB system and the damage the defects have caused.

B.   Rulings of Law

The New Hampshire Consumer Protection Act ("CPA") states
that "[i]t shall be unlawful for any person to use any unfair
method of competition or any unfair or deceptive act or practice
in the conduct of any trade or commerce within this state."   RSA
358-A:2.   "Such unfair method of competition or unfair or
deceptive act or practice shall include, but is not limited to,"
certain listed commercial actions.   Id.

"In determining which commercial actions not specifically
delineated are covered by the CPA, [the New Hampshire Supreme
Court has] employed the 'rascality test.'"   Axenics, Inc. v.

9

Turner Const. Co., 164 N.H. 659, 675 (2013).  "Under the
rascality test, the objectionable conduct must attain a level of
rascality that would raise an eyebrow of someone inured to the
rough and tumble world of commerce."  Id. at 675-76.  The New
Hampshire Supreme Court also is guided by interpretations of the
Federal Trade Commission Act, applying the following factors to
determine whether actions are unfair or deceptive:

> (1) Whether the practice, without necessarily having
> been previously considered unlawful, offends public
> policy as it has been established by statutes, the
> common law, or otherwise--whether, in other words, it
> is within a least the penumbra of some common-law,
> statutory or other established concept of unfairness;
>
> (2) whether it is immoral, unethical, oppressive, or
> unscrupulous;
>
> (3) whether it causes substantial injury to consumers
> (or competitors or other businessmen).

Becksted v. Nadeau, 155 N.H. 615, 619 (2007).

Ordinary breaches of contract and even hard bargaining do
not violate the CPA.  Axenics, 164 N.H. at 676.  On the other
hand, a party who makes "representations, knowing he lacked
sufficient knowledge to substantiate them, to induce the
plaintiff's purchase" violates the CPA.  Beer v. Bennett, 160
N.H. 166, 171 (2010) (citing cases).

Based on the legal standard applicable to Wolfeboro's claim
under RSA chapter 358-A, the court makes the following rulings of
law:

(1) Wright-Pierce knowingly misrepresented the capacity of
the RIB system on the Wolf 1-A site to Wolfeboro.

(2) Wright-Pierce knew that Wolfeboro would rely on its misrepresentations to hire Wright-Pierce to design and engineer the RIB system for the Wolf 1-A site, to obtain permits from the NH DES, to buy the property for the RIB system on the Wolf 1-A site, to construct the RIB system, and to operate the RIB system.

(3) Wright-Pierce's knowing misrepresentation of the capacity of the RIB system on the Wolf 1-A site to Wolfeboro violated RSA 358-A:2.

These rulings are supported by the evidence that the court has found to be credible and persuasive in this case and by the jury's advisory verdict on the Consumer Protection Act claim. The court finds and rules that Wolfeboro has proved all of the elements of the Consumer Protection Act claim by a preponderance of the evidence.

III.  Application of RSA 358-A:10

"If the court finds for the plaintiff [in an action brought under RSA chapter 358-A], recovery shall be in the amount of actual damages or $1,000, whichever is greater."  RSA 358-A:10. "If the court finds that the use of the method of competition or the act or practice was a willful or knowing violation of this chapter, it shall award as much as 3 times, but not less than 2 times, such amount."  Id.  "In addition, a prevailing plaintiff shall be awarded the costs of the suit and reasonable attorney's fees, as determined by the court."  Id.

A.   <u>Actual Damages</u>

The court has considered the testimony of David Ford, Linda Murray, and Wolfeboro's expert witnesses about the harm and losses that Wolfeboro has sustained because of Wright-Pierce's misrepresentations to Wolfeboro.  The court finds the testimony to be credible and properly supported.  Wolfeboro is claiming $7,698,532.42 in damages.  The court finds that Wolfeboro is entitled to $7,658,532.42 in actual damages on its Consumer Protection Act claim.

B.   <u>Willful or Knowing Violation</u>

The court finds and rules that Wright-Pierce's misrepresentations to Wolfeboro about the capacity of the RIB system on the Wolf 1-A site were knowing uses of deceptive acts in the conduct of commerce within this state in violation of the Consumer Protection Act, RSA 358-A:2.  <u>See</u> <u>State v. Moran</u>, 151 N.H. 450, 453 (2004) ("[A]ctions involving fraudulent representations in knowing disregard of the truth encompass culpable, willful behavior under the act.").

Under RSA 358-A:10, when a defendant knowingly uses deceptive acts in commerce in this state, there is a mandatory minimum damages of award of at least double damages.  Therefore, Wolfeboro is entitled to at least double damages and as much as treble damages.  The parties are afforded an opportunity to file memoranda to address the issue of multiple damages as provided in the conclusion.

12

C.  Costs of the Suit

As a prevailing plaintiff, Wolfeboro is entitled to the
costs of the suit, including attorneys' fees.  New Hampshire law
controls the calculation of an award of the costs of the suit
when, as here, the award is based on a New Hampshire statute.
See Town of Barrington v. Townsend, 164 N.H. 241, 250 (2012).
Wolfeboro shall file a motion for the costs of the suit that
shall include the legal standard for awarding the costs of the
suit, including attorneys' fees, under New Hampshire law, and
detailed evidentiary support for the costs and fees that
Wolfeboro seeks.

### Conclusion

For the foregoing reasons, the court finds and rules in
favor of Wolfeboro on Count V, Wolfeboro's claim under the
Consumer Protection Act, RSA chapter 358-A.  The court awards
actual damages in the amount of $7,658,532.42.  The court finds
that Wright-Pierce knowingly used deceptive acts in the conduct
of commerce within this state in violation of the Consumer
Protection Act, RSA 358-A:2.

Wolfeboro shall notify the court by **May 20, 2014,** if it
intends to seek damages in excess of the mandatory minimum award
of double damages under RSA 358-A:10.  If Wolfeboro intends to
seek damages in excess of double damages, Wolfeboro shall file a
properly supported motion on the issue of multiple damages **on or
before May 30, 2014.**  Wright-Pierce shall file its response

13

**within fourteen days of the date Wolfeboro files its motion.**
Memoranda filed in support of Wolfeboro's motion or in support of
Wright-Pierce's response are limited to twenty pages.  To the
extent that the parties rely on trial exhibits in their
memoranda, they shall not file the exhibits but instead shall
cite to the exhibit using the trial exhibit number with
appropriate references to pages.

Wolfeboro shall file a properly supported motion for an
award of costs of the suit **on or before May 30, 2014.**  Wright-
Pierce shall file its response, if any, **within fourteen days of
the date Wolfeboro files its motion.**

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
United States District Judge

May 15, 2014

cc:  Rhian M.J. Cull, Esq.
     John W. Dennehy, Esq.
     Daniel Miville Deschenes, Esq.
     Patricia B. Gary, Esq.
     Kelly Martin Malone, Esq.
     Seth Michael Pasakarnis, Esq.
     T. David Plourde, Esq.

14